528 COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term, B. and O. R. R. vs. Wilson. 1868.

# Wheeling.

## BALTIMORE AND OHIO RAILROAD COMPANY vs. THOMAS D. WILSON.

### January Term, 1868.

1. Where on the trial of a suggestion it has been suggested that the garnishee has not fully disclosed as to debts, or effects in his hands due the execution debtor, a copy of the original judgment is offered in evidence by the plaintiff, it is not error in the court below to permit it to be read to the jury, although probably not necessary to enable the plaintiff to make out his case; but it is error to permit a certificate of its recordation or docketing to be read, yet as the bill of exceptions noting the facts was taken to the admission both of the judgment and certificate, and as the admission of the former was proper, the court below committed no error in everruling the objection.

2. It was error to permit the docketed judgment to go in evidence after objection to the reading of the judgment had been made and overruled, and then objection made to the certificate of docketing going in evidence.

3. On a trial of a suggestion issued in pursuance of a *fieri facias* dated January 4th, 1864, which has been put in evidence, and a *fieri facias* dated December 10th; 1858, between the same parties, which does not appear to have created a lien because it was not in the hands of an officer to be executed, is offered in evidence, it cannot be used to show any lien under the *fieri facias* of January 4th, as any lien created by it was other and distinct from the one under investigation.

4. Where it does not appear on the trial of a suggestion, that the *fieri facias* under which an indebtedness to the judgment debtor is sought to be established, has been at any time delivered to any sheriff or other officer to be executed, there is no liability on the part of the garnishee by reason of any lien, although he may be indebted to the judgment debtor.

5. The oath of the jury, on such trial where want of full disclosure has been suggested, is substantially in conformity to the statute where they are sworn to well and truly inquire whether the garnishee has fully disclosed the debts due by him to, or effects in his hands of, the debtor, and also to ascertain the indebtedness of the garnishee to the debtor, and a true verdict render according to the evidence.

6. Where a judgment, on a like trial, is that the plaintiff recover of the garnishee the amount of his debt against the execution debtor, it is held to be correct, inasmuch as the remedy in relation to execution liens is the same

given by chapter 151 of Code 1860, for attachment liens in like cases where it is suggested that the garnishee has not fully disclosed his liability.

*Thomas D. Wilson* caused to be issued out of the clerk's office of the circuit court of *Wood* county, on the 25th day of January, 1864, a summons on a suggestion, alleging that by reason of a lien of *fieri facias* which issued from the same office on the 4th day of January, 1864, against the goods and chattels of the *North-western Virginia railroad company*, for the sum of 7,331 dollars and 39 cents, with legal interest thereon from the 1st day of February, 1855, till paid, and 9 dollars and 90 cents cost, there was a liability on the *Baltimore and Ohio railroad company*, which, he alleged, was indebted to the *North-western Virginia railroad company*. The summons required the *Baltimore and Ohio railroad company* to answer the suggestion on the 1st day of April term following.

The answer of the *Baltimore and Ohio railroad company*, by its president, was that it was not in any manner or form indebted to the *North-western Virginia railroad company*, nor had it any money, choses in action, or other personal effects belonging to that company, under its control, liable to the execution, or on which it was a lien.

*Wilson* suggested that the defendant, the *Baltimore and Ohio railroad company*, had not fully disclosed the debts due by it to, nor the effects in its hands of, the other company, and asked for a jury, according to the statute.

On the 3rd day of September, 1866, a jury was empannelled who were sworn to well and truly inquire whether the *Baltimore and Ohio railroad company* had fully disclosed the debts due by it to, or effects in its hands of, the *North-western Virginia railroad company*, and also to ascertain the indebtedness, if any, of the former to the latter company, and a true verdict to render according to the evidence.

The jury found a verdict as follows: "We, the jury find that the defendant has not fully disclosed by its answer its liability under the within suggestion, and we further find that there is a liability on the defendant by reason of the execution mentioned in the within suggestion, to the full

530    COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,       B. and O. R. R. vs. Wilson.       1868.

amount of said execution; that is to say, the sum of 7,331 dollars and 39 cents, with interest from the 1st day of February, 1855, and 9 dollars and 90 cents cost, and that said sum was at the date of the service of this suggestion due and owing by the defendant to the *North-western Virginia railroad company*." The defendant moved the court to set aside the verdict and grand it a new trial in the premises, upon the ground that the same was contrary to the evidence, the law, and the instructions of the court; but the court overruled the motion and gave judgment on the verdict.

There were three bills of exceptions taken during the trial, and one on the refusal of the court to set aside the verdict. The first was taken upon the refusal of the court, on the motion of the defendant, to prohibit the plaintiff from offering in evidence a copy of the judgment of the plaintiff against the *North-western Virginia railroad company*, and the certificate of its being docketed in the proper office of *Wood* county, on the 24th day of May, 1859, because, as the defendant maintained, the suggestion pending was of a lien created by the *fieri facias* issued January 4th, 1864, and it was not competent to charge the defendant with liability by reason of any other lien.

The second bill of exceptions was taken upon the refusal of the court to exclude from the jury the reading of the certificate of the docketing of the judgment of the plaintiff against the *North-western Virginia railroad company*, the judgment itself having been previously read, the plaintiff's attorney having stated that they did not seek to recover by virtue of any lien other than that created by the *fieri facias* of January, 1864.

The third bill was taken on the ground of the refusal of the court to reject as evidence the reading to the jury of an execution issued on the original judgment, on the 10th day of December, 1858, because no liability was claimed by reason of any lien other than that under the *fieri facias* of January 4th, 1864, and it was therefore irrelevant to the issue.

The fourth bill of exceptions was taken on the refusal of the court to set aside the verdict and grant a new trial, be-

cause, first, it was contrary to the facts and evidence, and secondly, because it was contrary to the instructions of the court, and to law, arising upon the facts as proven in the cause.

It was proven that the *Baltimore and Ohio railroad company* was in possession and control of the *North-western Virginia railroad*, constructed between *Grafton* and *Parkersburg*, from January 1st, 1857, to February 15th, 1865, when the former company purchased it under a deed of trust, and received large sums of money for the transportation of passengers and freight during that time; that the gross earnings on the *North-western Virginia railroad* from the year ending September 30th, 1858, to 1863, were 1,878,153 dollars and 25 cents. It was also proven that prior to September 30th, 1858, that the *Baltimore and Ohio railroad company* used and worked the *North-western Virginia railroad*, and received all freights and fares thereon, and that no annual report had been made by the president and directors of the former company since that for the year ending December 30th, 1863, because much of the transportation had been done for the United States government, for which no settlement had been made and the earnings could not be ascertained with precision and certainty.

It was proven by the defendant that it had taken charge of the *North-western Virginia railroad* under an agreement made on the 27th day of December, 1856, which is as follows: Articles of agreement made this twenty-seventh day of December, in the year one thousand eight hundred and fifty-six, between the Baltimore and Ohio railroad company of the first part, and the North-western Virginia railroad company of the second part, witness:

That for the purpose of promoting the interests of both companies in the transportation of passengers and freight to and fro between the city of Baltimore and the town of Parkersburg, and for intermediate distances, involving portions of both roads, and avoiding the necessity of changes of cars in any case at the junction of said roads, to the detriment of their business, and to the inconvenience of persons and

injury of property, the said parties of the first part have agreed, and do hereby agree, with the said parties of the second part, to work the road of the latter, with the rolling stock and machinery, officers and agents of the said parties of the first part, for the period of five years from the first day of January, in the year 1857, keeping the said road and its appurtenances during that time, and delivering them up at the expiration thereof, in as good repair (necessary wear and tear excepted) as when they undertake the charge of them.

In consideration whereof, the said parties of the second part agree that the said parties of the first part shall collect the entire revenue from all sources of the said road and its appurtenances, during the period aforesaid; and that all officers, agents and employees, necessary for the maintaining and working said road, shall, so soon as the same shall be open for travel to *Parkersburg*, be appointed and compensated by the said parties of the first part, and until the expiration of the period of five years aforesaid. And it is agreed that the gross revenue aforesaid shall be applied during the term of five years aforesaid, Firstly, to the payment of the interest coupons of the mortgage bonds of the said parties of the second part, as well as the interest coupons of 42,000 dollars of certain ten year bonds issued by the said parties of the second part, as said interest coupons shall become payable; said interest coupons to be cancelled and returned to the said parties of the second part from time to time. Secondly, the interest on the amount now, or hereafter to become due by the said parties of the second part, to the said parties of the first part. Thirdly, all taxes and assessments legally imposed on the said parties of the second part during the period of five years aforesaid.

And Fourthly, such sum, not exceeding 5,000 dollars per annum, as may be required by the said parties of the second part, for office and other expenses, irrespective of the maintenance and working of the said road.

And it is further agreed that the said parties of the first part shall keep accurate accounts of the gross revenue of the

said road, and shall render the same to the parties of the second part monthly; and that whenever forty per cent. of the said gross revenue for any year after the first, shall exceed the amount to be paid by the said parties of the first part, as enumerated in the foregoing paragraph of this agreement, for that year, such excess to the amount of 25,000 dollars, shall be applied by the said parties of the first part in reduction of the indebtedness to them of the said parties of the second part; and the residue of such excess, if any, for any year after the first, and the whole for the first year, shall be paid over to the parties of the second part. But no such payment shall exceed six per cent. of the par value of their capital stock, nor shall any such payment be made except for the first year, until 25,000 dollars for each and every year, of the five herein mentioned, after the first that has expired, has been appropriated to the reduction of their debt to the Baltimore and Ohio railroad company; and any further residue of such excess after the payment of the six per cent. aforesaid shall also go in reduction of the said debt. And it is further agreed that the accounts between the two companies, parties thereto, shall be stated semi-annually up to the 31st of March and 30th of September.

And it is further agreed that the Baltimore and Ohio railroad company, the parties of the first part hereto, shall at once return to the said parties of the second part such amount of the unguaranteed third mortgage bonds of the latter, now deposited with the said parties of the first part, as will be equal dollar for dollar to the amount of bonds or notes of the said parties of the second part, payable one year after the opening of the said road, and which they have issued, or contracted to issue to their contractors, with the interest accrued, and to accrue thereon—the said third mortgage bonds to be applied at par to the payment of the said bonds, or notes so given to contractors.

And it is hereby further agreed between the parties hereto, that the Baltimore and Ohio railroad company, the parties of the first part aforesaid, shall purchase from the North-western Virginia railroad company, the parties of the

second part hereto, at the actual cost thereof, on such terms as may suit the said purchasers, the property of the said parties of the second part at *Grafton*, at the junction of the two roads, including the real estate, buildings and machinery, with the appurtenances, other than the line of road proper from the said junction to the Tygarts Valley river, and all the rolling stock, machinery, tools, and other property provided or intended to be used by the said parties of the second part, for working the said road, or keeping the same and its rolling stock and appurtenances in repair. And the said parties of the first part agree to assume and perform the several contracts of the said parties of the second part, for the purchase or hire of other rolling stock, and its appurtenances intended to be used in working the said road, as though said contracts had been made originally on account of the said parties of the first part.

And the said parties of the first part further agree to advance to the said parties of the second part, from time to time, as required by the latter, such sum or sums of money or notes of the parties of the first part as, together with the amount to be paid them for the *Grafton* property and its appurtenances, shall amount to 100,000 dollars. And in order to reimburse said advance the parties of the second part agree that there shall be paid over to said parties of the first part the amounts remaining due and unpaid of the stock of the North-western Virginia railroad company subscribed at *Baltimore*, *Clarksburg* and *Weston*, as the same is collected, until such advance is reimbursed.

And it is further agreed that the cost of additions to and improvements upon the works and property of the said parties of the second part, properly chargeable to construction, including the cost of any additional ballasting of the said road, until the same shall be equal to the average of the road of the said parties of the first part, and which additions and improvements shall be deemed necessary by the said parties of the first part to facilitate or increase the business of the said road, and shall be made by the said parties of the first part, shall be added to the indebtedness of the parties of the

second part aforesaid, and shall be paid as herein provided.

And the said parties of the second part hereby agree to endeavor to obtain from the general assembly of Virginia the passage of an act authorizing the consolidation of the two companies parties hereto on terms satisfactory to the parties of the first part, under the name of the Baltimore and Ohio railroad company; and it is agreed that if any such act is passed at any time during the period of five years aforesaid, or of any further and similar period under an agreement like to the present, and is accepted by general meetings of the stockholders of the two companies, which shall be called for the purpose within two months after the passage of such act, then this agreement, or any renewal thereof, is to be determined; and the said Baltimore and Ohio railroad company hereby agree, in that event, to become responsible for all the then existing debts of the said parties of the second part contracted in the construction and completion of their road, or growing out of their now existing contracts, responsibilities and engagements, and they shall thenceforth be the owners of all the works, property and other assets of the said parties of the second part; and the said parties of the first part agree, in that event, to issue, when demanded, certificates of ownership of the stock of the said Baltimore and Ohio railroad company in exchange for the stock certificates of the said parties of the second part, at the rate of one share of the former of the par value 100 dollars for two shares of the latter of the par value of 50 dollars each. And it is further agreed that should the consolidation above referred to not take place during the period of five years, herein before provided for, then an agreement similar to the present shall be made for another and a like period, at the option of the said parties of the first part, on the same terms and conditions; but should there be no such further agreement entered into, no part of the debt incurred, or to be incurred, of the parties of the second part aforesaid to the said parties of the first part shall be payable, except as above provided, until the expiration of six months after the agreement between the said

companies for working the said road is finally determined, and on such determination, whenever it shall take place, the said parties of the first part shall reconvey to the said parties of the second part the *Grafton* property, on repayment of costs, including the costs of the improvements which may be made thereon by the said parties of the first part, without interest.

And the parties hereto hereby mutually bind themselves to the performance of the several acts to be respectively done or performed by them according to the tenor of this agreement. In testimony whereof the said companies have severally caused these presents to be signed by their presidents and sealed with their seals, on the day and year first above written.

(Signed) THOS. SWANN,
President N. W. V. R. R. Co.
CHAUNCEY BROOKS,
President B. & O. R. R. Co.

It was also proved that the Baltimore and Ohio railroad company used and worked the North-western Virginia company's road under the agreement, for the five years agreed upon, and that on the 9th day of January, 1862, its president submitted certain propositions to the North-western Virginia company for a continuance of the agreement substantially as follows:

1st. The absolute control of the working, repair and collection of the revenue of the North-western Virginia railroad to be in the hands of the Baltimore and Ohio company without the interference in any manner of the former company.

2d. The agents and employees required in carrying out this agreement to be appointed by the Baltimore and Ohio company alone, with such compensation as said company may deem judicious.

3d. The gross revenue to be applied as received, and as may become necessary, to the payment of an annual salary of 500 dollars to the president of the North-western Virginia railroad company from the 1st instant, which shall be

in full of all expenses and other charges on his part; to the payment of the interest on 11,500 dollars of the bonds of said company, which were given for the purchase money of certain property on the banks of the *Kanawha* river, in the town of *Parkersburg*, bought from *J. J. Jackson* and others, including the interest thereon, due on the 1st of July last; to the payment of the taxes properly assessed by the town of *Parkersburg* on certain property therein, including arrears up to this time; and to the expenses of working, maintenance, and for the use of machinery, and collecting the revenue of the said North-western Virginia railroad, as well as any other expenditure incurred in carrying out this agreement.

4th. It is understood that the said Baltimore and Ohio railroad company shall render to the said North-western Virginia railroad company a full statement of accounts of the dates of 1st July and 1st January during the continuance of this agreement, at which periods respectively settlements shall take place, which shall be the basis of further transactions.

5th. And whereas it has been a question how far the said North-western Virginia railroad company, its property and appurtenances, in whole or in part, are liable to taxation by the State of *Virginia*, which question is understood to have arisen with regard to other corporations of said State supposed to be similarly situated, and to be now pending in the courts of *Virginia*, it is agreed that should the decision of the highest appellate court settle the question of liability, and the property or effects of the said company be subject to seizure by the said State for the said taxes during the existence of this agreement, then the Baltimore and Ohio railroad company will pay the said taxes in addition to the items aforesaid.

6th. It is understood, however, that in the event of the working of the said North-western Virginia railroad being interfered with by military operations of any sort, or civil war, the Baltimore and Ohio railroad company shall be under no obligation to work the said road during the con-

538          COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,          B. and O. R. R. vs. Wilson.          1868.

tinuance of said interruption, nor shall it be under any obligation to repair the same; neither shall the Baltimore and Ohio railroad company be obliged to work the said road should the mayor and city council of *Baltimore* withhold their appropriation for the tunnels on the said North-western Virginia railroad under existing ordinances.

That these propositions were accepted on the 12th day of April, 1862. That the Baltimore and Ohio railroad company continued to work the road under these stipulations until it was sold under a certain trust deed and purchased by that company.

It was further proven that the North-western Virginia railroad company executed a mortgage to the mayor and city council of *Baltimore*, on the 21st day of March, 1853, in consideration of their guaranteeing the bonds of the company to the amount of 1,500,000 dollars, pledging its property to secure the same. Also, that it executed a like mortgage to the Baltimore and Ohio railroad company, on the 21st day of March, 1853, to secure it in the guarantee of the bonds of the North-western Virginia company in the sum of 1,000,000 dollars subject to the lien of the mortgage just before mentioned. And that on the 1st day of January, 1855, the North-western Virginia company executed a trust deed to one *James Cook*, to secure the proposed issue of two millions of its own bonds, subject to the lien of both the former mortgages, on all its property. It was further proven that on the 28th day of July, 1864, the mortgage to the city of *Baltimore* was assigned to the Baltimore and Ohio railroad company. That on the 15th day of February, 1865, the property of the North-western Virginia company was sold, by virtue of the mortgage to the city of *Baltimore*, at public auction, and was purchased by the Baltimore and and Ohio railroad company for the sum of 32,000 dollars, and that the same was conveyed to it by the name of the Parkersburg Branch railroad company.

It was also further proven that on the 1st day of July, 1855, the Baltimore and Ohio railroad company loaned to the North-western Virginia company the sum of 210,000

dollars for which a note was given, and also the sum of 6,300 dollars on the 1st day of July, 1856, for which a note was also taken, both of which notes were produced and read to the jury, as was also a note for the further sum of 260,-682 dollars and 42 cents loaned by the former company to the latter on the 10th day of July, 1856. That about the time of the last mentioned loans the Baltimore and Ohio railroad company loaned the North-western Virginia company the further sum of 500,000 dollars on account, and also advanced, in that year, the sum of 45,000 dollars in the payment of interest coupons on bonds issued by the latter company. It was further proven by *P. G. Van Winkle*, that he was president of the North-western Virginia company from January, 1857, until it ceased to exist by the sale of February, 1865; that it was his duty to supervise the financial and other affairs of the company and to see that accounts for and against it were properly kept, and that the balance due from that company to the Baltimore and Ohio railroad company on the 30th day of September, 1858, was 1,102,683 dollars and 99 cents, which increased gradually until on the 1st day of January, 1865, it amounted to 2,895,-925 dollars and 59 cents; that the Baltimore and Ohio railroad company never was at *any* time indebted to the North-western Virginia company; that the amount to be paid by the Baltimore and Ohio railroad company exceeded the amount of the gross receipts of the same by the working of the road by a sum not less than 200,000 dollars; and that the amount paid by it did exceed the amount of the gross earnings, so that no excess of the latter over the amount paid ever accrued, nor was there at any time a balance constituting a debt from the Baltimore and Ohio railroad company to the North-western Virginia company; that the Baltimore and Ohio railroad company paid in the four years following the contract of December, 1856, the sum of 210,-000 dollars per year as interest coupons on bonds issued by the North-western Virginia company, making in all 840,-000 dollars; (these coupons were exhibited to the jury;) and that the Baltimore and Ohio railroad company refused to

pay the interest coupons subsequently becoming due be-
cause the expenditures had exceeded the gross receipts from
the earnings of the road; that the earnings of the road had
never been sufficient to meet the interest accruing upon the
entire indebtedness of the road, including coupons, which
at one time was so great that the interest upon the same was
at the rate of not less than 1,000 dollars a day; that the
North-western Virginia company commenced the construc-
tion of its road with a capital of 500,000 dollars, and that
the cost of the road exceeded 5,000,000 dollars. It was also
proven that the account of the Baltimore and Ohio railroad
company at the North-western bank of Virginia at Parkers-
burg, which was opened in February, 1858, and was the de-
posits of receipts for freights and from passengers on the road,
and which likewise included money paid for freights and fares
on the main line of the Baltimore and Ohio railroad, and to
*Philadelphia* and *New York*, amounted up to within four or
five months of the trial, to the sum of 900,689 dollars and
20 cents. That the "working expenses" of the road for the
five years under the lease, amounted to 248,004 dollars and
6 cents.

It was proved that after the Baltimore and Ohio railroad
company had taken charge of the North-western Virginia
railroad under the contract of December 27th, 1856, it had
arched portions of several of the tunnels upon that road
with stone at considerable expense, particularly two, known
as *Brandy Gap Tunnel* and the *West Union Tunnel;* that this
was done because the ——— of timber shielding of the same
was deemed unsafe, and it was believed to be necessary for
the use of the road that the places referred to should be
arched with stone; but it was proved that the money ex-
pended in this way was no part of the earnings of the said
North-western Virginia railroad, but that said arching was
done by the Baltimore and Ohio railroad company, under a
contract with the mayor and city council of *Baltimore*, and
with money furnished by the latter for the purpose; that
the amount thus furnished by said *Baltimore* authorities was
between 80,000 and 100,000 dollars; that the whole amount

advanced by the city of *Baltimore*, for the use and benefit of the North-western Virginia railroad, including their liability for the principal of the bonds of said company guaranteed by the said city, the amount paid for interest on such bonds, and the amount advanced for arching said tunnels, amounted to about 1,900,000 dollars; that of this sum the said city of *Baltimore* agreed to relinquish 700,000 dollars, and in consideration of the sum of 1,200,000 dollars paid by the Baltimore and Ohio railroad company, to assign to the said Baltimore and Ohio railroad company the mortgage given to the said city of *Baltimore* by the said North-western Virginia railroad company of the 21st of March, 1853, and that this was the consideration of the said deed of assignment from the said city of *Baltimore* to the Baltimore and Ohio railroad company of the 28th of July, 1864; that the said Baltimore and Ohio railroad company only claimed on this assignment, as against the North-western Virginia railroad company, the said sum of 1,200,000 dollars, thus paid by it as aforesaid for the same; and this sum of 1,200,000 was not included in the indebtedness of the North-western Virginia railroad company to the Baltimore and Ohio railroad company herein before stated, but under the arrangement made for converting the indebtedness of the former company into stock, it was to receive stock to that amount.

It was further proved that the accounts of the earnings of, and disbursements for, the North-western Virginia railroad during the period the same was worked by the Baltimore and Ohio railroad company, were made up from manifests and ticket accounts, sent to the accounting officer, and the returns made by the local agents on the line of said road, collectors, disbursing and other officers, whose duty it was to make returns of amounts received or disbursed, to the accounting officer of the company in *Baltimore*, and that reports or returns were made by him to the president of the North-western Virginia railroad company, in the form of accounts current showing the amounts due from the said North-western Virginia railroad to the Baltimore and Ohio railroad company on the first day of October, in each and

every year from the year 1857 to the year 1864, both inclusive, and upon the 1st of January, 1865; and that such accounts current, showing the amounts due as herein before stated, had been received by the president of said North-western company without objection and accepted by him as correct.

It was proved that from the 1st of January, 1862, (when the contract of the 27th day of December, 1856, expired by its own limitation,) until the 12th day of April, 1862, the Baltimore and Ohio railroad company continued to use and work the said North-western Virginia railroad, without any contract with that company for that purpose, and that the nett profits of the said road, during that period, amounted to a sum not less than 25,000 dollars. It was also proved that in the settlement made with the said North-western railroad company, of the accounts of that fiscal year, the said company was credited with the amount of the nett earnings of said road, during said period from the 1st day of January, 1862, to the 12th day of April, 1862, as well as with the nett earnings of the remainder of said fiscal year. It was also proved that the Baltimore and Ohio railroad company was indebted to the North-western Virginia railroad company in the sum of 5,000 dollars for each year from January 1st, 1857, to January 1st, 1862, which was to be paid for office expenses of the North-western Virginia railroad company without regard to the indebtedness of the said latter road to the former.

It was proved that no annual report of the Board of Directors of the Baltimore and Ohio railroad company to the stockholders of said company, had been made since that for the year ending the 30th day of September, 1863, and that the reason assigned for the failure to make such subsequent annual reports was, that much work had been done on the Baltimore and Ohio railroad and on the North-western Virginia railroad since the report of 1863 had been due, for the United States Government; but that the accounts for such work had not been fully settled, and that without such settlements, amounts could not be accurately stated.

It was further proved that in the accounts stated between the Baltimore and Ohio railroad company and the North-western Virginia railroad, after the report of 1863 down to the account stated on the 1st day of January, 1865, the latter had been credited with the amounts apparently due to it for transportation upon its road as claimed against the Government, subject to correction, if necessary, when the accounts with the Government should be fully and finally settled—that is to say, to be reduced if any part of the amount claimed should be disallowed or rejected, or to be increased if the amount allowed should be greater than credited to said company in the accounts current between it and the said Baltimore and Ohio railroad company.

It was proven by the deposition of *John King, Jr.*, auditor of the Baltimore and Ohio railroad company, among other things, that no accounts of earnings of the North-western Virginia railroad company were made after October 1st, 1862, arising from Government transportation, because the accounts had not been adjusted by the Government; and that the balance against the North-western Virginia railroad company would be enlarged by a continuation of account down to the time of the taking of the deposition, July 14th, 1864; and by a statement filed with his testimony it appeared that the balance due the Baltimore and Ohio railroad company on the 1st day of October, 1862, was 2,488,532 dollars and 25 cents.

It was proven that the Baltimore and Ohio railroad company owned all the property at *Grafton* (the point of junction of the North-western Virginia railroad with the Baltimore and Ohio railroad), known as the "railroad property," excepting the track from the bridge across the Tygart Valley river, on said North-western Virginia railroad, connecting with the tracks of the Baltimore and Ohio railroad, which was retained by the North-western Virginia railroad company, and remained its property till the sale of the road in February, 1865.

The following instructions to the jury were asked for by by the plaintiff and given by the court:

1. If the jury believe there was no existing agreement between the Baltimore and Ohio railroad company and the North-western Virginia railroad company from the 1st day of January, 1862, until the 12th day of April, 1862, and that the nett profits arising from the use of the said North-western Virginia railroad in the hands of the Baltimore and Ohio railroad company were not applicable to any debt or claim in favor of the Baltimore and Ohio railroad company that existed prior to January 4th, 1864; then said fund or profits so arising cannot be applied in discharge of a debt or claim in favor of the Baltimore and Ohio railroad company created after the 4th day of January, 1864, and would constitute a fund liable to the plaintiff's claim.

2. The mortgages offered in evidence in this cause are liens upon the North-western Virginia railroad and its appurtenances, but are not liens upon the earnings of the road.

3. The jury are to judge from the circumstances whether there was actual notice of the lien of the execution of the 4th day January, 1864, that the fact of notice may be inferred from the circumstances as well as proved by direct evidence.

The following instructions to the jury were asked by the defendant, and given by the court:

1st. That as the suggestion in this case is of a liability by reason of the lien on the property and estate of the North-western Virginia railroad company, created by the *fieri facias* sued out by the plaintiff on the 4th day of January, 1864, the plaintiff cannot recover in this proceeding upon a liability on the defendant by reason of any lien on the estate of the said North-western Virginia railroad company, created by the judgment of the plaintiff against the said last named company of the 13th day of November, 1858, or by an execution sued out upon said judgment previous to that of the 4th day of January, 1864; *i. e.*, if plaintiff can recover at all, he must recover by virtue of his lien created by the execution of the 4th day of January, 1864.

2d. That the lien of the said *fieri facias* sued out on the

4th day of January, 1864, did not, nor could, relate back to any period anterior to its date, so as to charge the defendant in this proceeding with a liability under a lien existing prior to said date.

3d. That the indebtedness on the part of the Baltimore and Ohio railroad company to the North-western Virginia railroad company which was settled and paid by the former company to the latter, prior to the emanation of the said *fieri facias* of the 4th of January, 1864, (if the jury shall believe from the evidence that any such indebtedness so existed and was settled, and so paid prior to said date as aforesaid), cannot be made the ground of liablity in this proceeding under the lien created by the said *fieri facias* of the 4th day of January, 1864.

4th. That to enforce a liability on the part of the defendant by reason of the lien created in favor of the plaintiff upon the estate of the North-western Virginia railroad company by the *fieri facias* sued out upon his judgment on the 10th of December, 1858, by way of suggestion under the statute, the said plaintiff must have suggested such liability by virtue of the lien created by the said *fieri facias* of the 10th day of December, 1858, and cause the defendant to be summoned to answer the said suggestion of such alleged liability.

5th. That the act of January 30th, 1863, entitled "An act staying the collection of certain debts," did not prohibit the issuing of a writ of *fieri facias* on the judgment of the said plaintiff against the North-western Virginia railroad company of the 13th day of November, 1858, although it did forbid the placing the same in the hands of the sheriff or other officer whilst that act remained in force, and that there was no law in force forbidding the issuing of a *fieri facias* on the said judgment after the 1st day February, 1863.

6th. That the act of January 30th, 1863, entitled "An act staying the collection of certain debts," expired by its own limitation on the 1st day of January, 1864, and that after that day there was no act in force which forbade the placing of any execution that might have issued on the plaintiff's

said judgment after the 1st day of February, 1863, and of which the return day has not passed, in the hands of the sheriff to be levied.

7th. That the docketing of the said judgment of the plaintiff of the 13th day of November, 1858, on the 24th day of May, 1859, did not itself constitute the notice contemplated by section 3 of chapter 188 of the Code of Virginia, which would render the lien of the *fieri facias* sued out upon it on the 10th day of December, 1858, or that of the execution sued out upon the said judgment on the 4th day of January, 1864, as against the Baltimore and Ohio railroad company, as an assignee of estate of the said North-western Virginia railroad company, or as a person making payment to said last named company (if it shall appear to the jury that said Baltimore and Ohio railroad was such assignee for valuable consideration, or did make any payment to said judgment debtor) valid, after the expiration of the said act of the 30th of January, 1863, to-wit: after the 1st of January, 1864.

8th. That if the jury shall believe from the evidence, that whilst the said defendant was working the railroad of the North-western Virginia railroad company, and whilst it was receiving the earnings of said road (if they shall be satisfied that it did so work the said road, and receive the earnings thereof,) the said North-western Virginia railroad company, the judgment debtor, was indebted to the defendant to this proceeding, in a sum greater than the balance of such earnings after deducting the actual working expenses thereof, and greater than the amount that could be due to, or justly claimed by, the said North-western Virginia railroad company on account of the working of, and using its said road by this defendant, than any balances of such earnings after deducting such working expenses and any moneys received by this defendant, on account of said North-western Virginia railroad company, or that might be due from this defendant to said company on this account, might legally be retained by the said defendant as applicable to the indebtedness to it of the said North-western Virginia railroad company, and that neither the said North-

western Virginia railroad company nor a creditor claiming under it, could compel this defendant to pay the amount appearing due to the said North-western Virginia railroad company whilst the indebtedness of the said North-western Virginia railroad company to this defendant continued and remained unsatisfied; this instruction relates only to such indebtedness, if any, as existed previous to the 4th day of January, 1864.   In order to make this instruction applicable, it must appear that the balances or earnings were actually applied at the time, and placed to the claims of the defendant.  If these earnings were not applied until after the suggestion, they then constituted a fund liable to this execution notwithstanding the defendant may, after the 4th day of January, 1864, have made a settlement relating back prior to the date of this execution.   In other words, defendant cannot make a settlement disposing of, or appropriate these earnings in such a way as to have a retroactive effect to the prejudice of plaintiff's lien created by the execution of January 4th, 1864.

9th. That under the state of facts supposed in the 8th instruction, if the jury shall be satisfied from the evidence that the same existed, this defendant has the right to set off against the demand of the North-western Virginia railroad company for the amount justly due it from this defendant for the working and use of the railroad of the said North-western Virginia railroad company, so much of the indebtedness of the said company to this defendant as shall be equal to the amount then due from this defendant to said North-western Virginia railroad company.

10th. That if it shall appear to the jury that the Baltimore and Ohio railroad company, in stating the amount of the supposed indebtedness to it of the North-western Virginia railroad company in each, or any year, if such indebtedness shall appear in evidence included interest on the balance both of principle and interest due in the previous year, and if such addition of interest upon interest to the indebtedness of the North-western Virginia railroad company was improper, yet that addition of interest upon in-

terest to the indebtedness of the North-western Virginia railroad company did not affect with usury, the pre-existing just debt, if any, that might be due from said last named company to the Baltimore and Ohio railroad company, so as to invalidate such pre-existing just debt, if any, however much the North-western Virginia railroad company might be entitled to correct the account as stated, by striking out and deducting the amount of such interest computed upon interest that might be included in the amount stated, as the balance due in each or any year as aforesaid.

11th. That the notice, which under the law will render the lien of the *fieri facias* of the 4th day of January, 1864, valid as against the Baltimore and Ohio railroad company, if it shall appear to have made a payment to the said North-western Virginia railroad company on account of any indebtedness to said North-western Virginia railroad company, is notice of the lien of the said *fieri facias* of the 4th day of January, 1864, and not notice of the lien of the judgment on which the said *fieri facias* issued, nor the lien of any *fieri facias* that may have previously issued upon said judgment.

The defendant obtained a supersedeas from one of the judges of this court in vacation.

*George H. Lee* for the plaintiff in error.
*R. S. Small* and *M. P. Amiss* for the defendant in error.

MAXWELL, J.  On the 25th day of January, 1864, Thomas D. Wilson sued out of the clerk's office of the circuit court of Wood county, a summons, in which it was suggested that by reason of the lien of his writ of *fieri facias*, which issued from the clerk's office of said court on the 4th day of January, 1864, against the goods and chattels of the North-western Virginia railroad company, there was a liability on the Baltimore and Ohio railroad company, which was said to be indebted to the said North-western Virginia railroad company, and required the Baltimore and Ohio railroad company to appear at the then next April term of said

court to answer the said suggestion.   On the 3d day of February, 1864, a copy of this summons was delivered to an agent of the Baltimore and Ohio railroad company at Parkersburg.

On the 15th day of April, 1864, the Baltimore and Ohio railroad company filed its answer in the said court by which it denied that it was in any manner or form indebted to the said North-western Virginia railroad company, that it had not in its possession or under its control any money, choses in action or other personal effects belonging to the said North-western Virginia railroad company liable to the said execution, or on which the said Wilson's *fieri facias* was a lien.

Upon the filing of this answer or during the term at which it was filed, Wilson suggested that the Baltimore and Ohio railroad company had not in its answer fully disclosed the debts due by it to, or effects in its hands of, the said North-western Virginia railroad company, and on motion of the said Wilson it was ordered that a jury be empannelled to inquire as to such debts and effects.   A jury was afterwards sworn in said court on this order, which found that the Baltimore and Ohio railroad company had not fully disclosed by its answer its liability under the suggestion and found a liability to the amount of the plaintiff's execution against the North-western Virginia railroad company, on which finding of the jury the court rendered judgment. The Baltimore and Ohio railroad company feeling itself aggrieved by this judgment has obtained a supersedeas and brought the case here to be reviewed.   On the trial of the cause before the jury the defendant, now the plaintiff in error, objected and excepted to three different rulings of the court and obtained from the court bills of exception Nos. 1, 2 and 3, and, after the verdict of the jury was rendered, asked for a new trial, which was refused, but at the instance of the defendant the court certified the facts proved on the trial which are contained in defendant's bill of exceptions No. 4.   The first cause of error assigned is, that the court erred in permitting the judgment and certificate of the

docketing thereof in the county court mentioned in the first bill of exceptions, to be given in evidence to the jury. By reference to bill of exceptions No. 1 it appears that the plaintiff below gave in evidence to the jury, without objection, his suggestion and the summons thereon together with his execution bearing date on the 4th day of January, 1864, and described in the said summons, and then offered to read to the jury a judgment in the name of the said Thomas D. Wilson against the North-western Virginia railroad company, rendered on the 13th day of November, 1858, with a certificate showing that it was docketed in the clerk's office of the county court of Wood county, on the 24th day of May, 1859. To the reading of said judgment and certificate of the docketing of the same in evidence to the jury, the defendant objected because the suggestion in the case was of a lien created by the *fieri facias* issued on the 4th day of January, 1864, and it was not competent to charge the defendant with liability by reason of any other lien than that of the *fieri facias* of January 4th, 1864; but the court allowed the judgment and certificate showing the docketing of the same to be given in evidence to the jury, and the defendant excepted. I cannot see that it could prejudice the defendant in any way to allow the judgment itself to be given in evidence to the jury as it was, although it was probably not necessary to enable the plaintiff to make out his case that it should go in evidence to the jury. There was, therefore, no error in allowing it to be given in evidence. This is a suggestion under the tenth section of chapter 188 of the Code of Virginia, to fix a liability on the defendant by reason of the lien of the *fieri facias* of the 4th day of January, 1864, under the third section of the same chapter. The first question then attempted to be raised by this bill of exceptions is whether or not the plaintiff can reach property or effects through his suggestion by virtue of any other lien than the lien of the execution described in his suggestion. A judgment at common law is not a lien on personal estate or goods and chattels, but at common law a *fieri facias* was a lien on all goods and chattels

capable of being levied on from its date, and it is still so as between the parties and their personal representatives. But under section 11 of chapter 187 of the Code of Virginia, as well as under the English statute from which I suppose this provision is copied, as against purchasers for valuable consideration without notice and creditors, the writ shall bind what it may be levied on only from the time that it is delivered to the officer to be executed. This section provides that the writ may be levied as well on the current money and bank notes as on the goods and chattels of the person against whom the judgment is, but it is only a lien as long as it is capable of being levied. I apprehend that neither under the common law nor under this section was a *fieri facias* a lien upon choses in action.

For the purpose of enlarging the operation of the lien of the *fieri facias* and keeping alive liens created by the *fieri facias* under the law then existing, the third and fourth sections of chapter 188 of the Code were enacted. Section 3 of chapter 188 of the Code, page 777, provides that "every writ of *fieri facias* hereafter issued shall in addition to the effect which it has under chapter 187 be a lien from the time that it is delivered to a sheriff or other officer to be executed, upon all the personal estate of or to which the judgment debtor is possessed or entitled (although not levied on nor capable of being levied on under that chapter,) except in the case of a husband or parent such things as are exempt from distress or levy, &c.," "and except that as against an assignee of any such estate for valuable consideration, or a person making payment to the judgment debtor the lien by virtue of this section shall be valid only from the time that he has notice thereof. This section shall not impair a lien acquired by an execution creditor under chapter 187." The fourth section of the same chapter provides that, "The lien acquired under the preceding section shall cease whenever the right of the judgment creditor to levy the *fieri facias* under which the said lien arises, or to levy a new execution on his judgment, ceases or is suspended by a forthcoming bond being given and forfeited, or by a supersedeas or other

legal process." It is manifest that it is by virtue of the provisions contained in this third section that the *fieri facias* of January 4th, 1864, is a lien on the "personal estate" of the judgment debtor in the hands of the defendant unless it is a lien by virtue of some of the stay laws passed during the war. Under the third section of chapter 188, the lien of the *fieri facias* operates from the time it is delivered to the sheriff or other officer, on all of the personal estate of or to which the judgment debtor is at that time possessed or entitled, and not upon the personal estate of or to which he was before that time possessed or entitled. The office of the *fieri facias* is to create the lien and then to enforce the lien created by itself, but not to enforce liens created in any other way. The liens created by the several stay laws on the personal estate of judgment debtors are more complete than those created under the third section of chapter 188, referred to, but the several acts creating them are silent as to how they are to be enforced. They certainly cannot be enforced by writ of *fieri facias*, and I suppose as the law now is such liens can only be enforced in equity, there being no remedy at law. It appears to me plain that the plaintiff in the case under consideration was confined to the lien of the *fieri facias* described in his suggestion, and that he could not aid the lien of the *fieri facias* by proof of a lien under any of the stay laws.

Therefore, I think it was not right to allow the recordation or docketing of the judgment, as described in bill of exceptions No. 1, to be given in evidence to the jury as the only effect such docketing could have in this case would be to create a lien under the stay laws, but, as in bill of exceptions No. 1, the defendant objected to both the judgment and the certificate of the docketing thereof going in evidence, and as the judgment was proper evidence, the court committed no error in overruling the objection. *Day vs. Roth*, 18 New York Rep., 448.

The second cause assigned for error is that it was error to allow the docketed judgment to be read in evidence to the jury under the circumstances named in the second bill of ex-

ceptions. The second bill of exceptions is precisely like the first, except that the defendant objected and excepted to the docketed or recorded judgment being given in evidence, and did not object or except to the original judgment going in evidence. This bill of exceptions contains also the further fact that it was announced by plaintiff's attorneys, that they did not seek to recover by virtue of any other lien than that created by the *fieri facias* of the 4th day of January, 1864. I cannot see that this declaration of the attorneys could make evidence proper that was otherwise improper. It was not right to allow the docketed judgment to go in evidence to the jury because it was evidence of a lien under the stay laws, other and distinct from the lien of the *fieri facias* of January 4th, 1864, to which the plaintiff was confined by his suggestion as was stated when considering the first cause of error.

It appears from this bill of exceptions that the defendant made objection to the giving of this docketed judgment in evidence after the objection made in the first bill of exceptions had been overruled, and after the judgment therein named had been read in evidence to the jury, but before the certificate of the docketing of the judgment was read in evidence. I think, therefore, that the court did err in allowing the certificate of the docketing of the judgment to be read in evidence.

The third cause of error assigned is that it was error to allow the *fieri facias* of the 10th day of December, 1858, to go in evidence, under the circumstances disclosed in the third bill of exceptions. The third bill of exceptions shows that the execution of December 10th, 1858, was given in evidence after the documents mentioned in the first bill of exceptions had been put in evidence. It does not appear from the third bill of exceptions that the execution of December 10th, 1858, was ever a lien on the personal estate of the North-western Virginia railroad company under the third section of chapter 188 of the Code, because it does not appear that it was delivered to a sheriff or other officer to be executed. If there had been a lien created by it, it would have been a lien other and distinct from the lien of the *fieri*

*facias* of January 4th, 1864, which the plaintiff was endeavoring to enforce by his suggestion, and could not have been given in evidence to prove such lien. If the execution of December 10th, 1858, had been a lien, such lien might still be enforced by suggestion under it. See *Puryear* vs. *Taylor*, 12 Gratt., 401. But as it created no such lien, and was a part of the record of the case of *Wilson* vs. *The North-western Virginia railroad company* it could not be to the prejudice of the defendant that it was given in evidence, though the plaintiff to make out his case need not have given it in evidence.

The fourth ground of error assigned is that the court erred in refusing to set aside the verdict and grant a new trial because the verdict was contrary to the evidence and the law of the case, and to the instructions of the court itself. To have enabled the plaintiff to recover on his suggestion it was incumbent on him to show that there was a liability on the defendant below by reason of the lien of the *fieri facias* of the 4th day of January, 1864. From the suggestion and the summons thereon, as well as from the facts proved, the liability sought to be fixed on the defendant was, by reason of the supposed indebtedness of the defendant to the North-western Virginia railroad company, the judgment debtor. The indebtedness of the defendant to the judgment debtor, if any such indebtedness existed, was a mere chose in action, and the *fieri facias* of January 4th, 1864, for the reasons heretofore given was a lien upon it only under section third of chapter 188, and then only from the time that it was delivered to a sheriff or other officer to be executed. It does not appear from the facts in the case that this execution was at any time delivered to any sheriff or other officer to be executed, so that there was not by reason of the lien thereof any liability on the defendant, though the defendant may have been indebted to the judgment debtor.

But if the *fieri facias* of January 4th, 1864, had created such a lien as would create a liability on the defendant if indebted to the judgment debtor, the facts certified prove

clearly that the defendant was not indebted to the judgment debtor on or after the day of its date.

The plaintiff occupied no better situation than his judgment debtor would have occupied in a suit to recover from the defendant, the garnishee, a debt due such judgment debtor. Such being the case, could the North-western Virginia railroad company, in any form of action, have recovered from the Baltimore and Ohio railroad company, on the facts here certified, the amount recovered by the plaintiff or any other amount? In the first place no question of usury can arise in this case because incorporate companies are exceptions from the operation of the usury laws. Code, chapter 57, section 38, page 337.

The facts taken in the most favorable light for the North-western Virginia railroad company show clearly, that instead of the Baltimore and Ohio railroad company being indebted to the North-western Virginia railroad company there was a large indebtedness the other way. It seems to me, therefore, that the court did err in refusing a new trial.

The fifth ground of error assigned is that the oath administed to the jury was informal and irregular and not the oath required by the statute to be administered in such cases. Although the oath administered was informal, yet it was substantially the oath required by the statute, and could not have prejudiced the defendant.

The sixth and last ground of error assigned is that the judgment pronounced by the court upon the verdict found was irregular and improper and was not the order which the statute directs to be made in cases of this character. The judgment of the court is that the plaintiff recover of the defendant "7,331 dollars and 39 cents with interest thereon from the 1st day of February, 1855, until paid, and 9 dollars and 90 cents costs, and his costs by him about his suit in this behalf expended." Under the twelfth section of chapter 188, Code of Virginia, the person summoned on a suggestion shall be examined on oath. If it appear on such examination that there is a liability on him, the court may order him to pay any debts, or deliver any estate for which

there is such liability, or pay the value of such estate to any officer whom it may designate, and the levy of an execution on such order shall be valid, although levied by such officer.

It is plain according to the strict letter of this section that if a liability appears on the examination of the person summoned, the court is to order him to pay any debts or deliver any estate for which there is such liability, or pay its value to an officer designated by the court. By the thirteenth section of the same chapter it is provided that if it be suggested that the person summoned has not fully disclosed his liability the proceedings shall be according to the 18th and 19th sections of chapter 151, Code of Virginia. The jury in this case was empanneled under the 19th section of the last named chapter. This section provides that "the court shall cause a jury to be empanneled without any formal pleading to inquire as to such debts and effects, and proceed in respect to any such found by the jury in the same manner as if they had been confessed by the garnishee." Sections 11, 12, 13, 14, and 15, of said chapter 188, and sections 17, 18, 19 and 23, of said chapter 151, are intended to provide for attachment or judgment creditors process for the recovery and application of debts due to their debtors by third parties, and are therefore *in pari materia*, and must, according to the well established rule of law, be taken together as if they were one chapter. Bacon Ab. title, Statute. *Canal Company* vs. *Railroad Company*, 4 Gill and Johns. p. 5 The sections here referred to in chapter 188, were enacted subsequently to the section referred to in chapter 151, and give substantially the same remedy in relation to execution liens, that the sections in chapter 151 give in relation to attachment liens. It is another well established rule of law that when an action founded upon one statute is given by a subsequent statute in a new case, everything annexed to the action by the first statute is likewise given. According to either of these rules, the judgment on a verdict of a jury rendered under the said 19th section, must be the same where the debt of the plaintiff is established, whether the proceeding be upon attachment or suggestion. If the ver-

dict of the jury in this case had been rendered against the defendant as garnishee in an attachment, the judgment rendered upon the verdict would be right. *Joseph* vs. *Pyle and wife.* There is, therefore, no error in the form of the judgment in this case.

The judgment will have to be reversed with costs to the plaintiff in error, and the cause remanded to the circuit court of Wood county for a new trial to be had therein.

The other judges concurred.

JUDGMENT REVERSED.

---

* See *ante* page 449.